# In The Matter Of:

*Randolph Jones, Jr., et al. vs.*
*Advance Bureau of Collections, LLP, et al.*

---

*Kenneth M. French*
*December 14, 2015*

---

*Combs Court Reporting*

*3638 Vineville Avenue*

*Macon, Georgia 31204*

*800-474-6987*

*www.combscourtreporting.com*



COMBS COURT REPORTING

PROFESSIONAL, DEPENDABLE REPORTERS

Serving the entire state of Georgia

Min-U-Script® with Word Index

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF GEORGIA
                        MACON DIVISION
       _____

RANDOLPH JONES, JR.,
individually and for all
others similarly situated,

      Plaintiff,                    CIVIL ACTION NUMBER:

vs.                                 5:15-CV-00016-MTT

ADVANCE BUREAU OF
COLLECTIONS, LLP
d/b/a ADVANCE BUREAU OF
COLLECTIONS;
KENNETH M. FRENCH;
EVELYN T. TRIMBLE;
DAVID J. ALDRICH;
LEE ANN BARRETT;
MIA H. FERRUZZO-O'BRIEN
and T. PATAT,

      Defendants.



                      DEPOSITION OF

                    KENNETH M. FRENCH

                    December 14, 2015

                 Commencing at 9:52 a.m.
                 Concluding at 11:14 a.m.

                  Combs Court Reporting
                  3638 Vineville Avenue
                  Macon, Georgia  31201

          Reported by:  Janet S. Paris, CCR B-1835

                  COMBS COURT REPORTING
                  3638 Vineville Avenue
                  Macon, Georgia  31204
                     (478) 474-6987
               www.combscourtreporting.com
```

```
1     APPEARANCES OF COUNSEL:

2     On Behalf of the Plaintiffs:

3     STEVEN H. KOVAL, Esq.
      The Koval Firm, LLC
4     Bldg. 15, Suite 120
      3575 Piedmont Road
5     Atlanta, Georgia  30305
      404-350-5900
6     Steve@kovalfirm.com

7     DAVID F. ADDLETON, Esq.
      Addleton Ltd. Co.
8     355 Cotton Avenue
      Macon, Georgia  31201
9     404-797-7166
      Dfaddleton@gmail.com
10
      On Behalf of the Defendants:
11
      JONATHAN K. AUST, Esq.
12    MICHAEL CHAPMAN, Esq.
      Bedard Law Group, P.C.
13    2810 Peachtree Industrial Blvd.
      Suite D
14    Duluth, Georgia  30097
      678-253-1871, ext. 202
15    Jaust@bedardlawgroup.com

16

17

18

19

20

21

22

23

24

25
```

```
1                    INDEX OF EXAMINATIONS

2                WITNESS:   KENNETH M. FRENCH

3                                                    Page

4    Cross-Examination by Mr. Koval                     6

5    Direct Examination by Mr. Aust                    51

6    Recross-Examination by Mr. Koval                  53

7

8                        - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF EXHIBITS

 2   Number          Description                    Page

 3   (None marked)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   STIPULATIONS:
 2           MR. KOVAL:        This is the deposition of
 3       Kenneth M. French taken in the case of Randolph
 4       Jones, Jr. vs. Advance Bureau of Collections, LLP
 5       et al in Case Number 5:15-CV-CV00016, pending in
 6       the Middle District of Georgia, United States
 7       District Court, Macon Division.
 8           Could you swear him in, please.
 9                       * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    KENNETH M. FRENCH,

 2          having been produced and first duly sworn,

 3                   testified as follows:

 4                   CROSS-EXAMINATION

 5   BY MR. KOVAL:

 6        Q    Could you state your name for the record,

 7   please.

 8        A    Kenneth M. French.

 9        Q    Mr. French, you and I have not met before, have

10   we?

11        A    No.

12        Q    I mean, as far as you know.  Have you had your

13   deposition -- have you ever had your deposition taken

14   before?

15        A    No.

16        Q    Okay.  I'm going to go over some things that

17   might be helpful for you to know about the process.  If at

18   any point you need a break, let me know.  This isn't an

19   endurance contest.  I don't expect we're going to be here

20   the whole day anyway.  But if you need a break, let me

21   know.  My practice to take a break at the hour point

22   anyway.

23             I'm going to be asking you questions and the

24   court reporter is going to be taking down everything that I

25   ask you and your response, so she needs an audible
```

1    response.  So if we were having a regular conversation and

2    you shook your head or something, I would know what you

3    meant and it wouldn't be a big deal.  But for purposes of a

4    deposition, she needs a yes or a no as opposed to a nod of

5    the head.

6            If at any time you don't understand my question,

7    either because I didn't ask it very well or I coughed in

8    the middle of asking it or there was some other noise and

9    you didn't hear it, just let me know and I'll try to repeat

10   it in a way that you're able to -- so that you can answer

11   it.

12           Are you under the influence of any medications

13   that would affect your ability to give truthful answers

14   today?

15       A    No.

16       Q    Okay.  And do you have any other impediments

17   that would cause any difficulties in giving truthful

18   answers today?

19       A    I speak very softly and I have 30 percent loss

20   of hearing, so you'll need to speak up.

21       Q    I'll do that.  So again, if -- I talk pretty

22   loudly, but if you don't hear me, just let me know.  Not a

23   problem.

24       A    Okay.

25       Q    And as I told you, I'm getting over a cold, so

1    I'll do my best not to cough.

2         A    Okay.

3         Q    Can you tell me where you're employed?

4         A    Advance Bureau of Collections.

5         Q    And how long have you been employed there?

6         A    47 years.

7         Q    And what is your current position there?

8         A    Manager.

9         Q    And how long have you been the manager?

10        A    44 years.

11        Q    Do you know what kind of business entity Advance

12   Bureau of Collections is?

13        A    An LLP.

14        Q    And what is your understanding as to what an

15   LLP is?

16        A    A limited liability partnership.

17        Q    And you are not a member of the partnership?

18   You are not a partner, correct?

19        A    I'm not an owner in any fashion.

20        Q    Right.  You are solely an employee?

21        A    Yes.

22        Q    Do you have any plans to retire?  And if it's

23   okay with you, I'm going to refer to Advance Bureau of

24   Collections, LLP as ABC, okay?  So when I say ABC, that's

25   what I mean.  Do you have any plans to retire from ABC?

      1          A     I'm not sure.

      2          Q     Have you had discussions with anyone about

      3   retiring from ABC?

      4          A     No.

      5          Q     And what is your compensation at ABC?

      6          A     Approximately $60,000 a year.

      7          Q     Is that W-2 wages?

      8          A     No.  That's pre-tax, before tax.

      9          Q     That's your gross wages.  Am I saying that

     10   right?

     11          A     I don't understand.

     12          Q     The 60,000 you're referring to, is that the

     13   gross number, the big number?

     14          A     That's gross.

     15          Q     And out of that, taxes are taken out, correct?

     16          A     Absolutely.

     17          Q     And do you get a -- do you get paid on a regular

     18   basis?

     19          A     Twice a month.

     20          Q     And is it the same amount each time?

     21          A     No.

     22          Q     How does it vary?

     23          A     I think I draw 1150 before tax on the 1st and

     24   3850 before tax on the 15th.

     25          Q     Are there bonuses or commissions that you're

1  paid on top of the compensation that you just talked about?

2       A    It ceased a long time ago.

3       Q    So there was a time when you received bonus

4  compensation, but no longer?

5       A    No longer.

6       Q    Does ABC have any kind of profit sharing or any

7  type of extra compensation that's paid to you?

8       A    (Shaking head negatively).  I have a SEP IRA.

9  The company contributes about $150 a month to that.

10      Q    Any other benefits of employment?

11      A    No.

12      Q    Are you aware of a key man life insurance

13 policy?

14      A    A long time ago.

15      Q    Are you, do you know if you're still covered by

16 that?

17      A    To my knowledge, yes.

18      Q    How old are you?

19      A    In three days I'll be 73 years old.

20      Q    Happy birthday.

21      A    Thank you.

22      Q    Can you tell me what your responsibilities as a

23 manager are?

24      A    I'm a head cheerleader.

25      Q    Okay.  Can you give me a little bit more detail?

```
 1        A    I try to determine monthly goals and then cheer
 2   and inspire people on a daily basis to make sure we stay on
 3   track and achieve them.
 4        Q    So do you manage the other employees?
 5        A    In a step process.
 6        Q    Okay.  Let's talk about how many other employees
 7   there are.  There's you and who else?
 8        A    Nine other people.
 9        Q    Nine others?
10        A    (Nodding affirmatively).
11        Q    But you are the highest manager within the
12   company, correct?
13        A    Yes.
14        Q    Do you do any actual collections yourself?
15        A    Yes.
16        Q    So you are a debt collector?
17        MR. AUST:          Objection.
18        THE WITNESS:       I --
19        MR. KOVAL:         You might want to explain.
20        MR. AUST:          When I object you still
21        have to answer unless I instruct you not to
22        answer.  But you can answer his question.
23        MR. KOVAL:         I should have said this at
24        the beginning.  The rules allow your attorney to
25        state an objection and then, like he said, unless
```

1          he instructs you not to, which would be a serious

2          instruction, then you can just go ahead and

3          answer.

4                    THE WITNESS:      Okay.  I'm a manager, not

5          a collector.

6     BY MR. KOVAL:

7          Q    Okay.  I thought you -- maybe I misunderstood.

8     I thought you said you do engage in debt collection, that

9     you do collect on debts?

10         A    Well, if I meet somebody at the counter or if

11    somebody comes in to pay or calls in to make payment over

12    the phone, but I don't work a collection unit.

13         Q    I'm sorry, you do not work a collection unit?

14         A    I do not work a collection unit.

15         Q    I'm not sure I understand what that means.  What

16    does that mean to you?

17         A    Well, that would mean an employee who is a

18    full-time collector has a certain assignment of accounts

19    which he or she works.

20         Q    I understand.  So I understand that you're not

21    a -- that you don't work a collection unit and you don't

22    consider yourself a full-time debt collector, but there are

23    occasions where you do collect debts for ABC, correct?

24         A    Yes, there are.

25                   MR. AUST:        Objection.

```
 1  BY MR. KOVAL:
 2       Q    In fact, you are a debt buyer as well, aren't
 3  you?
 4       A    No.
 5       Q    You don't buy debts?
 6       A    No.
 7       Q    Well, don't you have situations when you've got
 8  a client who a consumer owes money to that your client will
 9  assign the debt to you personally to bring suit on?
10            MR. AUST:        Objection, relevancy.
11            THE WITNESS:     Yes.
12  BY MR. KOVAL:
13       Q    And those assignments say that you have paid
14  valuable consideration?
15            MR. AUST:        Objection, relevancy.
16            THE WITNESS:     It says that, but there's
17       no money exchanged.
18  BY MR. KOVAL:
19       Q    So what it says isn't true?
20            MR. AUST:        Objection.
21            THE WITNESS:     No.  Consideration is
22       working it on a contingency basis.
23  BY MR. KOVAL:
24       Q    Well, I'll tell you what.  Just to make it
25  easier, if you could sort of give me an overview of how it
```

1   works and then maybe I'll have some follow-up questions for

2   you.  So you have a situation where one of your clients is

3   owed money from a consumer and the consumer doesn't pay.

4   So what would be the typical scenario of what happens after

5   that?

6           MR. AUST:          Objection, form.

7           THE WITNESS:       Okay.  My client would

8       sign a transfer.

9   BY MR. KOVAL:

10      Q    Okay.

11      A    My company in turn would file a complaint in the

12  Magistrate Court, based on that transfer, in my name.

13      Q    What is that transfer transferring?

14      A    It transfers a verified balance and date of

15  service into my name so that my company attorney can file

16  the action in the Magistrate Court.

17      Q    Okay.  So just to make sure I understand it, you

18  all have a lot of doctor clients or medical practices,

19  right?

20      A    Yes.

21      Q    I'm just going to make some -- Dr. Smith, okay?

22      A    (Nodding affirmatively).

23      Q    A consumer owes Dr. Smith money.  ABC sends a

24  demand letter.  The consumer doesn't pay.  And then at some

25  point Dr. Smith assigns the account to you?

1      A     Correct.

2      Q     Have I got that right?

3      A     Right.

4      Q     All right.  And so he's assuming -- he's

5  assigning ownership of that account to you so that you can

6  bring a collection action?

7      A     No.

8      Q     Tell me where I went wrong on that.

9      A     The ownership doesn't change hands.

10      Q     What changes hands?

11      A     Just the right to bring the action in my name

12  rather than his name on his behalf.

13      Q     So what do you call that right?

14      A     A transfer.

15      Q     A transfer of what?  I'm just trying to

16  understand what it is that's being transferred.  That's

17  what I'm trying to get at.  What is your understanding of

18  what's being transferred to you?

19      A     The right to take action on behalf of the doctor

20  in my name as opposed to his.

21      Q     And your understanding of that is that when that

22  right to take the action is transferred to you, that you do

23  not at that time own the account?

24      A     I do not.

25      Q     Okay.  So you agree with me?  Your understanding

1  is you do not own the account at that point?

2       A    I do not own the account.

3       Q    All you have is the right to bring that action

4  that has been transferred to you?

5       A    That's correct.

6       Q    When is the last time you brought an action on

7  behalf of a doctor's office or medical practice?

8            MR. AUST:        Objection, relevancy.

9            THE WITNESS:     Never.

10 BY MR. KOVAL:

11      Q    Okay.  I guess I didn't ask it the right way.  I

12 understood that the right to take action is transferred to

13 you?

14      A    Right.

15      Q    And I think you called that an assignment?  Is

16 that the correct term?

17      A    Transfer.

18      Q    Okay.  A transfer?

19      A    Uh-huh (affirmatively).

20      Q    Is there then a suit filed?

21      A    Not always.

22      Q    But sometimes?

23      A    Sometimes.

24      Q    So what I was trying to get at before is when is

25 the last time a suit has been filed where the account has

```
 1    been transferred to you?
 2            MR. AUST:        Objection, relevancy.
 3            THE WITNESS:     Probably within this
 4         month.
 5    BY MR. KOVAL:
 6         Q    And then when that lawsuit is filed, how is the
 7    lawsuit titled?  Who is suing whom?
 8            MR. AUST:        Objection, relevancy.
 9            THE WITNESS:      It might say Koval, you
10         and you by transfer to K.M. French by J. Roger
11         Davis.  The reason -- can I give you a reason for
12         that?
13    BY MR. KOVAL:
14         Q    Yeah.
15         A    The reason for that is most medical bills are
16    too small to warrant going to court on their own, but a lot
17    of medical providers have repeat offenders who come in and
18    come in and come in and never pay.
19         Q    Right.
20         A    So you can group the group and maybe along with
21    someone else's claim and make one single action in court to
22    speak for, say, three people or four people, which reduces
23    any costs assigned to the debtor and which makes it
24    reasonable to file in a magistrate court as opposed to
25    those clients not ever paying.
```

1          Q     Okay.  So I think I understand part of it, which

2   is, let's say it's me and I go to a doctor and I don't pay.

3   Maybe I have got three separate accounts or I have gone

4   three separate times.  And so you group three different

5   bills together into one lawsuit?

6          A     Yes.

7          Q     But I didn't understand the part about there

8   being multiple parties.

9          A     Or say they come to you and you refer them to

10  another doctor and they have the --

11         Q     Oh, I see.

12         A     -- Same Day Surgery Center also.  Maybe all

13  three of those claims are still unpaid.  One single action

14  could speak for the three.

15         Q     I think I understand.  If I owed several doctors

16  and you happened to be the debt collector who is handling

17  them --

18         A     Right.

19         Q     -- you could aggregate them and you could -- the

20  idea, I guess, is you'd bring the action on behalf of the

21  separate doctors all in one suit?

22         A     My attorney would bring the action in my name

23  for the several doctors.

24         Q     Okay.  So just so I understand your position --

25  I'm not tying to argue with you.  I'm just trying to

1    understand how you're viewing this.  You're not saying that

2    you own the account.  You're just saying that the right to

3    sue has been transferred to you; is that correct?

4         A    That's correct.

5         Q    And therefore if it's several different doctors

6    who are owed the money, they could all transfer their

7    rights to you and then you could bring one lawsuit against

8    this consumer?

9         A    My attorney could bring one lawsuit.

10        Q    Okay.  So, but you're a party to the lawsuit,

11   right?  I mean, it's got your -- what's your understanding

12   of who you are in that lawsuit?

13        A    I'm the transferee.

14        Q    The transferee of the right to sue?

15        A    Yes.

16        Q    And do you get a -- is there a document for each

17   account that is transferred to you assigning that right to

18   sue?

19             MR. AUST:         Objection, relevancy.

20             THE WITNESS:      Yes.

21   BY MR. KOVAL:

22        Q    And have you had to actually go to court on

23   those types of cases?

24        A    Rarely.

25        Q    But you have?

```
1          A     Yes.

2          Q     And are you the one who testifies?

3          A     No.

4          Q     Who testifies?

5          A     A witness from the original owner of the

6    account.

7          Q     Do you show up in court?

8          A     Sure.

9          Q     And do you always have an attorney representing

10   you in court?

11         A     Absolutely.  I cannot practice law.

12         Q     Do you provide the consumer, the debtor, who

13   allegedly owes money, with notice that the debt has been

14   assigned to you?

15              MR. AUST:        Objection, relevancy.

16              THE WITNESS:       He received that as part

17        of the complaint when the complaint is filed.

18        It's provided to them at that time.

19   BY MR. KOVAL:

20         Q     And in those lawsuits where there's been a

21   transfer to you, you are the plaintiff, correct?  You are

22   the -- no?

23         A     No.

24         Q     Okay, so now I'm confused.  I thought I

25   understood, but now I'm confused.  So who is the plaintiff?
```

1        A    The plaintiff is the original creditor.  I'm the

2   transferee of that original creditor.

3        Q    So if it's several medical practices suing on

4   the debt, are there several plaintiffs named in the

5   lawsuit?

6        A    All the plaintiffs would be named by K.M.

7   French, Transferee.

8        Q    And who is the attorney who represents ABC in

9   those collection -- well, let me strike that.  Who is the

10  attorney involved in those lawsuits that you just

11  discussed, those collection lawsuits?

12       A    The Law Firm of James Davis.

13       Q    And who is Mr. Davis representing in those

14  lawsuits?

15       A    My clients.

16       Q    Not you?

17       A    Well, I'm the transferee, but he's representing

18  my clients.

19       Q    Okay.  Does he represent you also?

20       A    I guess he does indirectly, yes.

21       Q    Indirectly, right?  That's what you said?

22       A    Yes, he does represent me as well.

23       Q    Okay.  And so let's say you win, whoever brought

24  this lawsuit wins the lawsuit and there's a judgment.

25  Whose name is the judgment in?

1              MR. AUST:          Objection, relevancy.

2    BY MR. KOVAL:

3         Q    He will let you know when he doesn't want you to

4    answer.  He's just stating his objections for the record.

5         A    Probably three-fourths of the time the judgment

6    is in K.M. French, transferee for the named plaintiffs.

7         Q    And what's the next step once there's been a

8    judgment obtained?

9              MR. AUST:          Objection, relevancy.

10             THE WITNESS:      It varies.

11   BY MR. KOVAL:

12        Q    Well, is there a typical scenario?

13             MR. AUST:          Objection, relevancy.

14             THE WITNESS:       We're a very low key

15        collection agency.  90 percent of the people that

16        I sue come in and sign a consent agreement and

17        make a pay plan.

18   BY MR. KOVAL:

19        Q    Before or after a judgment?

20        A    Before a judgment.

21        Q    Okay.  But that still leaves some folks who you

22   have to get a judgment against, right?

23        A    Rarely, but yes.

24        Q    And then do you take enforcement action on that

25   judgment?

```
 1              MR. AUST:        Objection, relevancy.
 2              THE WITNESS:     Well, you would hope that
 3      you would.
 4   BY MR. KOVAL:
 5         Q    Like, for example, a garnishment?
 6              MR. AUST:        Objection, relevancy.
 7              THE WITNESS:     That could be one.
 8   BY MR. KOVAL:
 9         Q    The monies that come in from that, from those
10   judgments, who does that go to?
11              MR. AUST:        Objection, relevancy.
12              THE WITNESS:     It goes into the bank and
13      is later remitted to the client.
14   BY MR. KOVAL:
15         Q    Does that go into your bank account or ABC's
16   bank account?
17         A    No, it doesn't go in my account at all.  It goes
18   in ABC's account.  I have no account in my name.
19              (Inaudible whispering)
20              MR. AUST:        If you can't -- if you
21      absolutely have to ask me a question, feel free to
22      ask me a question, but everything you say is going
23      to be on the record.
24              THE WITNESS:  Okay.
25
```

```
1    BY MR. KOVAL:
2         Q    When we started, I asked you if your deposition
3    had been taken and you said -- in any other cases, and you
4    said it had not, correct?
5         A    That's what I said.
6         Q    And just so you know, these are sort of standard
7    questions that we ask in every case.  Have you ever had a
8    lawsuit filed against you?
9         A    Against me?
10        Q    Yes.  Well, aside from this one.  You are named.
11        A    Not to my knowledge.
12        Q    Have you ever been accused of a crime?
13        A    A crime?
14             MR. AUST:         Objection, relevancy.
15             THE WITNESS:      No.
16   BY MR. KOVAL:
17        Q    Therefore, you've never been charged with a
18   crime?
19        A    No.
20        Q    And you've never been convicted of a crime?
21        A    No.
22        Q    Standard questions.
23        A    Okay.
24        Q    Did you review documents in preparation for your
25   deposition today?
```

1          A     Yes.

2          Q     Can you tell me what you reviewed?

3          A     No.

4          Q     Is that because you don't remember or you don't

5     want to tell me?

6          A     No, it's because I don't remember.

7          Q     Do you remember if you looked at the complaint,

8     the lawsuit that was filed against you?

9          A     I have looked at it a great number of times over

10    the past year, but...

11         Q     Okay.  When is the last time you reviewed

12    documents in preparation for today?

13         A     When I was preparing to come here the last time

14    and nobody showed.

15         Q     I'm sorry.  (Coughing)  That's something you'll

16    need to discuss with your attorney.  Sorry about that.  I

17    think that was --

18                    (DISCUSSION OFF THE RECORD)

19              MR. AUST:         No, no, no.  He was asking

20         when you reviewed and just -- he didn't appear.

21              MR. KOVAL:        Oh, okay.  I thought he

22         showed up because he said no.

23              MR. AUST:         No.  He didn't appear, but

24         I believe that's what he's saying is the last time

25         he reviewed documents was before this deposition

```
 1          was rescheduled.
 2               MR. KOVAL:        I understand.  All right.
 3  BY MR. KOVAL:
 4          Q    Have you discussed this case with anybody else
 5  aside from your attorneys?
 6          A    No.
 7          Q    You have not discussed this case with
 8  Ms. Trimble?
 9          A    Well, yes, with Ms. Trimble.
10          Q    Anybody else?
11          A    Be more specific.
12          Q    Well, I'm trying to be broad.  I would like to
13  know who you have discussed this case with.
14          A    The other defendants and my attorney.  That's
15  it.
16          Q    Did Ms. Trimble have anything to -- or did
17  Ms. Trimble say anything to you about her deposition?
18          A    No.
19          Q    Have you received any training regarding FDCPA
20  compliance?
21          A    Yes.
22          Q    When is the last time you received that?
23          A    Probably 10 years ago.
24          Q    Are you familiar with what the allegation is in
25  the complaint as far as the FDCPA violation?
```

```
 1        A     Two words missing.

 2        Q     And what words were those?

 3        A     "In writing."

 4        Q     And do you have an opinion as to whether that

 5   was in violation of the FDCPA?

 6              MR. AUST:           Objection, calls for a

 7         legal conclusion.

 8              THE WITNESS:        Restate the question.

 9   BY MR. KOVAL:

10        Q     Yeah.  Do you have an opinion as to whether that

11   was a violation of the FDCPA?

12        A     No, I don't think it was.

13        Q     And what's the basis -- why do you think that?

14        A     I know the Miranda has to be in there.  I'm not

15   certain that those two words being missing is a violation,

16   but obviously the study I've done indicates that they

17   belong there and they were not there.

18        Q     Do you know how it came to be that -- well, my

19   understanding is that the words used to be in the initial

20   letter that you sent to consumers.

21        A     And they are now.

22        Q     But at some point they got omitted, right?

23        A     Apparently.

24        Q     And have you been able to figure out how that

25   happened?
```

1          A    No.

2          Q    You know that you didn't do it though, right?

3   You didn't take those words out?

4          A    I didn't do it.  I wouldn't even know how to do

5   it.

6          Q    As the manager for ABC, you take responsibility

7   for the actions of your staff, right?

8               MR. AUST:       Objection.

9               THE WITNESS:    Most of them.

10  BY MR. KOVAL:

11         Q    Do you think that you have responsibility for

12  this letter being sent out as it was?

13              MR. AUST:       Objection.

14              THE WITNESS:    Yes.

15  BY MR. KOVAL:

16         Q    Now, recently I received a copy of an amended

17  answer filed on your behalf.  Do you know what I'm talking

18  about?

19         A    No.

20         Q    Let me get a copy.  I'm going to hand you what's

21  been marked as Plaintiff's Exhibit 23.  You can take a

22  moment and look at that.

23              MR. KOVAL:       Do you need a copy?

24              MR. AUST:        Yes, please, if you have

25      one.

1    BY MR. KOVAL:

2         Q    Have you seen this document before?

3         A    I have.

4         Q    And this was filed on your behalf, correct?

5         A    Yes.

6         Q    Do you know why an amended answer was filed?  Do

7    you know what the purpose was?

8         A    To give a more in depth explanation.

9         Q    To anything in particular?

10        A    To our policy concerning letters.

11        Q    And you may want to refer to this.  I'm going to

12   leave it out here.  You don't have to, but it's going to be

13   there for your convenience.  Actually, take a look at page

14   two of your answer under Second Defense.

15        A    Okay.

16        Q    And I'm going to be reading from right here, so

17   you can follow.  Okay?  And I'm focusing on the words,

18   "notwithstanding the maintenance of procedures reasonably

19   adapted to avoid any such error."  So my question for you

20   is, what procedures did you or ABC have in place to avoid

21   the error that occurred in this case?

22        A    We have our attorneys -- we have a law firm of

23   attorneys who specialize in FDCPA review our letters.  They

24   tell us any changes or any need that might occur, what the

25   verbiage of letter is.  They send it back to us.  I review

1    it.  Ms. Trimble reviews it.  We have either our software

2    people or somebody that is directed by them within my

3    office go in the Crystal Reports and make whatever change

4    the law firm says is needed.  Nobody can make any changes

5    to any of those letters with our knowledge.

6          Q    I'm sorry, with --

7          A    No one can make any change to any of our letters

8    to our knowledge without the attorney reviewing them first

9    and then instructions from our software people to enable

10   them to go into the Crystal Report and make the change.

11         Q    And how often does an attorney review the

12   initial letters that go out?  You refer to those as A

13   letters, don't you?

14         A    Well, the initial notice from our office is

15   called an A Notice.

16         Q    An A Notice.  And the A Notice is what's at the

17   center of this lawsuit, right?

18         A    That's correct.

19         Q    The A Notice.  So when was the last time the A

20   Notice was reviewed prior to the filing of this lawsuit?

21         A    I think the last time it was reviewed by outside

22   counsel was either '07 or '08.

23         Q    And when is the last time you reviewed the A

24   letter prior to the filing of this lawsuit?

25         A    In January of last year when we were served with

1    this.

2         Q    Before that.  Before you got the lawsuit.

3         A    There was no reason to review it before that

4    because there had been no changes made in it.

5         Q    Well, how were y'all able to be sure that the

6    law hadn't changed that may have required a change to the

7    letter?

8              MR. AUST:        Objection.

9              THE WITNESS:     I have no knowledge of

10        that.

11   BY MR. KOVAL:

12        Q    No knowledge of a change to the law or no

13   knowledge of the procedure?

14        A    There was no change in procedure and I have no

15   knowledge of a needed change in law.

16        Q    But how would you know?  You're not a lawyer,

17   right?

18        A    I don't have to be a lawyer to know.  I look on

19   the ACA forum every day and I get readings from all over

20   the trade associations that tells what we can or cannot do

21   or do or do not need to do.

22        Q    So aside from having had an attorney look at the

23   letter in 2008 -- I believe that's the last time you say an

24   attorney had looked at it, right?

25        A    Approximately, yeah.

1        Q     What other procedures did you or ABC have in

2   place to avoid an error?

3        A     The letters come out of a Crystal Report, which

4   cannot be obtained or entered by anyone within our

5   business.

6        Q     But someone within the business could make a

7   change to the letter, correct?

8        A     No.

9        Q     So how do you account for the fact that the

10  letter was changed?

11            MR. AUST:          Objection.  You can

12        answer.

13            THE WITNESS:       I have no idea how the

14        letter got changed.  Nobody, none of my employees

15        have access to the file the letters come from and

16        nobody in the software company was requested to

17        make a change, so...  I am 73 years old.  Maybe I

18        have a bad memory, but I don't recall ever asking

19        anyone to make a change in the wording.

20  BY MR. KOVAL:

21        Q     So what measures were in place to prevent a

22  change from being made?

23        A     The fact that the Crystal Report's file could

24  not be accessed by anyone.

25        Q     Well, it can be accessed by -- who can it be

1    accessed by?

2         A    My software people could access it and they

3    could instruct one of my data input employees to access it

4    if there was something that needed to be changed and they

5    couldn't dial in.  But they have the ability to dial in.

6         Q    So what would prevent an employee from making a

7    change to the letter?

8         A    A lack of technical knowledge and the lack of

9    passwords.

10        Q    So who had the passwords that would enable them

11   to make a change to the letter?

12        A    I don't know.

13        Q    You don't know?

14        A    I don't know when the letter got changed.

15        Q    Have you tried to determine when the letter got

16   changed?

17        A    There's no way to determine that that I can see.

18        Q    Well, who has access to the passwords?

19        A    My software people would.  That's it.

20        Q    You have access, right?

21        A    No.  I have no reason to have access to it.

22        Q    The change would not necessarily have to be made

23   through your software people, though, right?

24        A    Well, I'm not a computer guru, so I don't know

25   what other people might be able to dial in and get into the

1   report and make any change in it.  I do not have that
2   knowledge.
3          Q    So do you have a theory as to how this change
4   was made to the letter?
5               MR. AUST:      Objection, speculation.
6               THE WITNESS:      No.
7   BY MR. KOVAL:
8          Q    Do you think this was done maliciously?
9               MR. AUST:      Objection.
10              THE WITNESS:      I have no way of knowing
11      that.  I can't speculate that because I don't have
12      any reason to think that.
13  BY MR. KOVAL:
14         Q    Uh-huh (affirmatively).  But you didn't have any
15  review process in place to make sure that the letters
16  maintained its integrity, did you?
17         A    Yes, you do have, because any edits made remain
18  the same until the next time another edit is required.
19         Q    What's the process for generating these A
20  Notices?
21         A    I'm not qualified to answer that.
22         Q    Who is?
23         A    Tammy Patat would be.
24         Q    So was there any procedure in place for the
25  periodic review of the A Notices?

1      A    I already answered that.

2      Q    Well, I don't think I understood what your

3 answer was.  What is that?  Aside from the attorneys.  I

4 understood that.  You said you thought an attorney had

5 reviewed it in 2008 and that the --

6      A    The attorney does our letter of review.  Then if

7 there are any suggestions or any changes that are deemed to

8 be needed or necessary --

9      Q    Right.

10      A    -- they send that back to us.  We review it

11 between myself and Ms. Trimble.  Then we call the software

12 people to give us access to the Crystal Report and either

13 they make the changes on our behalf, which we approve, or

14 we have one of my data input people go in and make the

15 changes, which they would do a bind and make sure we have

16 done it correct.

17      Q    And who are those data input people who would be

18 capable of making that change?

19      A    Tammy Patat would be.

20      Q    Anybody else?

21      A    If Tammy were out sick, I could have somebody

22 else sit down and muddle through it, but Tammy would be the

23 one.

24      Q    And she could do it without the aid of any

25 outside --

```
 1        A     No.

 2        Q     No, I'm correct or no, she needs help?

 3        A     She would need help.  She would not be able to

 4   access Crystal Reports without the software person's

 5   support.

 6        Q     Do you know who received the letter that's the

 7   basis for the lawsuit?

 8        A     I've seen the name.  I do not know this person,

 9   no.

10        Q     I'm sorry?

11        A     I've seen his name.  I do not know the person.

12        Q     You all provided a 200-plus page report with the

13   names and addresses of people who received that letter,

14   right?

15             MR. AUST:         Objection.  I don't think

16        the discovery was who received it.  I think it was

17        the -- who their system had generated a letter to

18        be sent to.  I just wanted to clarify that so

19        we're not saying it was received.  It's letters

20        that were generated on their system.

21             MR. KOVAL:        Yeah.  That's an improper

22        objection.  That's coaching your witness.  Please

23        don't do it again.

24             MR. AUST:         Well, I don't want you to

25        misconstrue what the discovery request that you
```

1    guys requested.  What was requested was the names

2    and letters of people who the system generated the

3    letter to.  Your question isn't related -- the

4    document you're referring to isn't what your

5    question was asking.

6            MR. KOVAL:        Then the deponent can say

7    that, but you can't coach your witness.  So I'm

8    just stating on the record just to be real clear.

9    You can state an objection, but you can't coach

10   your witness.

11           MR. AUST:       I disagree that I was

12   coaching, but I understand.  Please proceed.

13   BY MR. KOVAL:

14       Q    So you're aware of a 200-plus page document that

15   listed names and addresses of people related to this letter

16   that was sent out, correct?

17       A    Related to a letter, yes.

18       Q    So do you know who this letter was sent to?

19       A    No.

20       Q    And how is it that you don't know who that

21   letter was sent to?

22       A    The same way you wouldn't know.

23       Q    Can you explain that a little bit more?  I don't

24   work at ABC.

25       A    Well, there's a list of 200 names and addresses.

1    Apparently the letters were sent to the people on that 200-

2    page list, but I do not know who they were.

3          Q    Well, your database has that information,

4    though, correct?

5          A    We provided that to you.

6          Q    Okay.  So do you know what document I'm

7    referring to?

8          A    I don't know which document number.  You just

9    referred to it.

10         Q    I'm asking you because -- I'll show it to you.

11         A    Okay.

12         Q    I'll show you what's been marked as Plaintiff's

13   Exhibit 3.

14         A    Yes, sir.

15         Q    Can you identify what that is?

16         A    I've never seen it before.

17         Q    You have never seen it before?

18         A    If we provided it to you, it's a list of the

19   people who received or were sent that letter from my

20   office.

21         Q    Your attorneys produced that in response to the

22   Request for Documents that was sent to you.

23         A    Okay.

24         Q    So you're saying you didn't review that before

25   your attorneys sent it out?

```
 1        A    I had no reason to review it.  What would be
 2   gained by that?
 3        Q    Well, you're the defendant in the case.
 4        A    It's a list of --
 5             MR. AUST:        This list?
 6             MR. KOVAL:       Yeah.
 7             MR. AUST:        I don't believe it was Ken
 8        French's discovery responses individually.  I
 9        believe that's ABC.  The question you're asking is
10        individually.
11             MR. KOVAL:       That may be.
12             MR. AUST:        So I think that's the
13        confusion.
14             MR. KOVAL:       All right.
15             MR. AUST:        I think that's what the
16        confusion is.  ABC sent that and not Ken French
17        individually.
18             MR. KOVAL:       Okay.
19             THE WITNESS:     As I understand, it was
20        sent to him and then to you in PDF form.  I have
21        never seen that paper before.
22   BY MR. KOVAL:
23        Q    Did you see the PDF?
24        A    I seen it go across the screen.  That was it.
25        Q    So what is your understanding of what this
```

```
 1    Plaintiff's 3 represents?
 2         A    Plaintiff's 3 is approximately 200 pages of
 3    names and addresses of people that had a letter generated
 4    by my office which they may or may not have received.
 5         Q    I understand that you don't know whether it was
 6    received, but you have no reason to doubt they were sent
 7    the letter, correct?
 8         A    No.
 9         Q    I mean, I'm correct?
10         A    Yes.
11         Q    And what type of collections does ABC engage in?
12    Are these consumer debts that you collect?
13              MR. AUST:        Objection.  Calls for a
14         legal conclusion.
15              THE WITNESS:     Consumer debt.
16    BY MR. KOVAL:
17         Q    These are not business debts that the consumers
18    owe?
19         A    There may be a sprinkling of business debt in
20    there, but primarily consumer debt.
21         Q    And is it mostly medical practices that you all
22    have the clients?
23         A    Probably 75/25 medical.
24         Q    And when I say y'all, I mean ABC.
25         A    ABC.
```

1        Q      Any idea what the remainder percentage would be?

2    What types of businesses come to you as clients?

3        A      Well, it would be retail, landlord, auto repair

4    shops, exterminating companies, rent -- what do you call

5    these little places where you rent a room and put your

6    stuff in?  Storage units.

7        Q      Rental storage?

8        A      Stuff like that.

9        Q      And approximately how many clients does ABC

10   have?

11       A      Maybe as little as 300 or as high as 8 or 900.

12       Q      So somewhere between 300 and 900, you think is

13   pretty fair?

14       A      We probably generate, say, 200 statements a

15   month, so I'm not sure what answer you're looking for,

16   but --

17       Q      And when you say 200 statements, you mean to

18   your clients, right?

19       A      Right.

20       Q      And is there a standard fee that ABC receives

21   for its work?

22       A      No.  There are variable fees.

23       Q      Is there a range?

24       A      Probably a range around 35.

25       Q      That's 35 percent?

1        A    Right.

2        Q    Of the amount collected?

3        A    Right.

4        Q    And just to make sure I understand the process.

5   So if a letter is sent out to a consumer and the consumer

6   makes a payment, that payment goes to ABC?

7        A    Not always.

8        Q    Sometimes it goes directly to your client?

9        A    Yes.

10       Q    So how do you determine how you get paid, how

11  ABC gets paid?

12       A    If the money comes to our office, we deposit the

13  check and process the payment in our system.  If the money

14  goes to my client's office, they call me and report who

15  they are, who paid and the amount he paid, and we process

16  that payment as a direct pay.

17       Q    So you're depending upon their being honest with

18  you that they received money?

19       A    Oh, absolutely.  Sometimes that's a misnomer.

20       Q    Okay.  Do you have any reason to believe that

21  the plaintiff's account in this case is subject to an

22  arbitration provision?

23       A    I don't know.

24       Q    You said I do not, right?

25       A    Sir?

1          Q    I'm sorry.  I had trouble -- could you repeat
2    your answer?
3          A    I said I do not know.
4          Q    Do you know how many people the A Notice was
5    sent to in the time frame referenced in the complaint?
6          A    No.
7          Q    Do you know how many times Crystal Reports was
8    accessed since last time an attorney reviewed the A
9    Notice?
10         A    No.
11         Q    Have you had any discussions with anyone
12   concerning the purchase or sale of ABC?
13         A    A discussion?
14         Q    Yeah.
15         A    No.
16         Q    You've never had any conversations with
17   Ms. Trimble regarding the purchase or sale of the business?
18         A    12 or 15 years ago, yes.
19         Q    And is that the last time?
20         A    Yeah.
21         Q    What do you recall about those discussions?
22         A    I recall a buy-sell agreement, I think way back
23   about '92 or '93.
24         Q    Do you know who initiated those discussions?
25         A    I think Ms. Trimble did.

1        Q    And did you have an interest in purchasing ABC?

2        A    No.  She just, I think was approaching the point

3   where she might have considered a sale but she wanted to

4   make certain because I had been there probably 35 years at

5   that time, that if a sale were to occur, that I would be

6   given the first option.

7        Q    Are you interested in purchasing ABC?

8        A    No.

9        Q    Do you have a copy of the buy-sell agreement?

10       A    I do.

11       Q    Where is it?

12       A    I don't know.  I don't --

13       Q    But you don't know where it physically is?

14       A    No.

15       Q    Do you know what the mechanism of the buy-sell

16   agreement was for defining the price?

17       A    That's already been provided to you.  It's in

18   the copy of the agreement that you have.

19       Q    I wish that were true.

20       A    If you have it, it's there.  It is true.

21       Q    No, I don't have it.

22            MR. AUST:        They don't have a copy of

23       the buy-sell agreement.

24            THE WITNESS:      Oh, okay.

25

```
 1   BY MR. KOVAL:
 2        Q    So you provide it to your counsel, correct?
 3        A    Yes.
 4        Q    Do you have any objection to us having a copy of
 5   the buy-sell agreement?
 6        A    It's 15 years old.  It doesn't mean anything.  I
 7   have no objection to that.
 8        Q    Thank you.
 9        A    But I think it should have already been asked
10   for.  So on that basis, I object.
11        Q    Do you know what the --
12        A    Does the record show that I object?
13        Q    I'm sorry?
14        A    Does the record show that I object?
15        Q    She takes down everything you say.
16        A    Okay.
17        Q    So when is the last time you looked at this buy-
18   sell agreement?
19        A    Probably a few months ago.
20        Q    And how was the price to be determined for the
21   sale of the business?
22   ███████████████████████████████████████████████████
23   ███████████████████████████████████████████████████
24        Q    Uh-huh (affirmatively).
25   ███████████████████████████████████████████████████
```



```
 1
 2
 3
 4
 5    Q
 6
 7
 8    A
 9    Q
10    A    Right.
11    Q
12
13         MR. AUST:          Objection, calls for
14    speculation.
15 BY MR. KOVAL:
16    Q    Have I got that right?
17    A    I don't think so.
18    Q    Tell me where I'm wrong.
19    A
20
21
22    Q    I see.
23    A
24    Q    Okay.
25    A    Because the year is almost done.  And because
```

1   (indicating).

2        Q    I'm not sure the court reporter was able to

3   accurately get that down.  You were -- what were you trying

4   to say?

5        A    Well, in the collection business, in the last

6   10 years it's been steadily declining clients and steadily

7   declining fees and steadily declining profits.  That's why

8   my answer earlier when you asked me would I be interested

9   in buying, I said no.

10       Q    I see.  So maybe 10 years ago it would have been

11  more appealing to you, but because of the trends in the

12  industry, not so much right now?

13       A    Because what now?

14       Q    Because of the trends in the industry, you would

15  not be interested in today purchasing the business.  Is

16  that a fair --

17       A    You asked would I have been interested 10 years

18  ago.

19       Q    Yes, sir.

20       A    Yes, I would have been 10 years ago but not

21  today.

22       Q    Because the profits have gone down; is that

23  correct?

24       A    The profits have gone down and the irritation

25  and aggravations and situations like this have increased to

1   the point owning a collection agency is not really a

2   desirable thing.

3       Q    I understand.  Does ABC have any lines of

4   credit?

5       A    No.

6       Q    Does it have any credit cards?

7       A    Yes.  Office Depot and Sam's.

8       Q    Do you know how long the ABC has had the Office

9   Depot card?

10      A    No.

11      Q    How about Sam's?

12      A    No.

13      Q    I mean, a long time?

14      A    Probably a long time, but I don't know.

15      Q    Okay.

16      A    I just know we make purchases on those and we

17  pay them on a monthly basis when they come in.

18      Q    Do you know what the fair market value of ABC

19  is?

20          MR. AUST:       Objection, calls for

21      speculation.

22          THE WITNESS:    I don't know.

23  BY MR. KOVAL:

24      Q    And do you know what the net worth of ABC is?

25          MR. AUST:       Objection, calls for

```
 1      speculation.
 2           THE WITNESS:    I can tell you that we own
 3      a couple of printers, a server, and about 10
 4      computers. ████████████████████ That's it.
 5      We don't own anything else.  And there's nothing
 6      there to sell.
 7  BY MR. KOVAL:
 8      Q    Do you think that the business has a value as an
 9  ongoing concern?
10           MR. AUST:      Objection, calls for
11      speculation.
12           THE WITNESS:    I could not even predict
13      that.
14  BY MR. KOVAL:
15      Q    Does ABC own the building that it's in?
16      A    No.
17      Q    Who owns that?
18      A    E.L. Trimble and L.G. Holloway, Jr.
19      Q    And rent is paid to those two individuals?
20      A    The rent is paid to Lamar Street Building.
21      Q    What is Lamar Street Building?
22      A    The office we operate from.
23      Q    Do you know what type of entity that is?
24      A    No.
25      Q    Do you know if that's a partnership between --
```

1        A     No, I don't know.

2        Q     You don't know?

3        A     (Shaking head negatively).

4        Q     Okay.  Do you know what the rent is?

5        A     $2,300 a month.

6        Q     Do you know if that is a fair price for the

7    space that you're renting?

8        A     I think so.

9            MR. KOVAC:       We've been going for a

10       little bit over an hour, so let's take a short

11       break and then come back.  We'll wrap up your

12       individual part, take lunch, and then we'll come

13       back and do the 30(b)(6) component.  I understand

14       you're going to be giving testimony on behalf of

15       ABC?

16           THE WITNESS:     I guess.

17           MR. KOVAL:       Let's take about a

18       five-minute break.

19               (Off the Record)

20           MR. KOVAL:       I don't have anymore

21       questions for his individual deposition.

22       Obviously, you can ask him some questions if you

23       want.

24           MR. AUST:        Okay.  Just a couple.

25

1                    DIRECT EXAMINATION

2    BY MR. AUST:

3        Q    During your testimony earlier I believe you said

4    that, correct me if I'm wrong, that your, the last time you

5    received any FDCPA training was 10 years ago; is that

6    correct?  When did you get any type of formal training?

7        A    That may be correct, but I review on a daily

8    basis and I train people and I coach my employees on a

9    daily basis.  So 10 years ago I attended a FDCPA seminar

10   that had to do with a TCPA, which was just getting started

11   up at that time.  I'm a past president of the Georgia

12   Collectors Association.

13       Q    In that time period, did you receive any

14   correspondence about FDCPA compliance?

15       A    Yes.

16       Q    What type of e-mail correspondence or any type

17   of correspondence you received, where do you receive that

18   from?

19       A    I get e-mails on my computer on a daily basis

20   from ACA and from two other trade associations that have to

21   do with the collection industry and then of course I get

22   the Collector Magazine.  We have been a member of ACA

23   since 1956.

24       Q    Explain to me what ACA is.

25       A    The American Collectors Association.  They now

```
 1   refer to themselves as Credit Professionals Association.
 2        Q    So although you haven't had any formal FDCPA
 3   training in the last 10 years, you have done compliance
 4   updates through these correspondence that you received?
 5        A    Yes.
 6             MR. KOVAL:        Object to the form of the
 7        question.
 8   BY MR. AUST:
 9        Q    What was your response?
10        A    My response is yes.  Perhaps I misunderstood the
11   question.  The last time I went to a seminar as such was
12   probably close to 10 years ago, but I do updates every
13   single day, all the time.
14        Q    During your deposition earlier there was a
15   discussion about a buy-sell agreement.  Do you recall in
16   any discovery request for the plaintiff where they asked
17   for the buy-sell agreement?
18        A    No.
19        Q    Do you know when the buy-sell agreement is
20   dated, if it's dated at all?
21        A    ████████████████████████████████████
22   ███████████████████████████████████████████████
23   ███████████████████████████████████████████████
24             MR. AUST:        Anything else?
25             MR. CHAPMAN:     Just real quick.
```

```
 1              MR. AUST:        Can I have a second?
 2                  (Off the Record)
 3              MR. AUST:        Back on the record,
 4         please.
 5    BY MR. AUST:
 6         Q    Earlier in your testimony there was a question
 7    about you feeling responsible for the letter being sent.
 8         A    No, I'm not responsible for the letters being
 9    sent.
10         Q    What you were saying earlier was that as a
11    manager, you felt responsible for the letters being sent?
12         A    No.  As a manager, my responsibility is that
13    calls be made and correspondence to be sent each day, but
14    I'm not personally responsible for that at all.  I don't
15    even know that it occurs.  I just know that that's what one
16    of my employees has the responsibility for.
17              MR. AUST:        I think that's all the
18         questions I have.
19              MR. KOVAL:       I've got a follow-up.
20                     RECROSS-EXAMINATION
21    BY MR. KOVAL:
22         Q
23
24         A
25         Q
```

```
 1  correct?

 2       A    Yes.

 3            MR. KOVAL:        That's all.

 4         (Discussion Off the Record)

 5            MR. AUST:         Are we closing

 6      Mr. French's individual deposition?

 7            MR. KOVAL:        Yes.

 8            MR. AUST:         Now we can go off the

 9      record.

10         (Off the record at 11:14 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          DISCLOSURE

2    STATE OF GEORGIA

3    Pursuant to Article 10.B of the Rules and Regulations of
     the Board of Court Reporting of the Judicial Council of
4    Georgia, I make the following disclosure:

5    I am a Georgia Certified Court Reporter, reporting for
     Combs Court Reporting, 3638 Vineville Avenue, Macon,
6    Georgia 31204, 800-474-6987.

7    Combs Court Reporting is not disqualified for a
     relationship of interest under the provisions of O.C.G.A.
8    9-11-28(c).

9    Combs Court Reporting was contacted by the offices of David
     F. Addleton, Attorney at Law, to provide court reporting
10   services for this deposition.

11   Combs Court Reporting will not be taking this deposition
     under any contract that is prohibited by O.C.G.A.
12   15-14-37 (a) and (b).

13   Combs Court Reporting has no exclusive contract to
     provide reporting services with any party to the case,
14   any counsel in the case, or any reporter or reporting
     agency from whom a referral might have been made to cover
15   this deposition.

16   Combs Court Reporting will charge its usual and customary
     rates to all parties in the case, and a financial
17   discount will not be given to any party to this
     litigation.

18

19

20   _____

                              Janet S. Paris, CCR
21                            Certificate No. B-1835

22

23

24

25

```
1                       CERTIFICATE
2    GEORGIA, HOUSTON COUNTY:
3              I, Janet S. Paris, Certified Court Reporter,
4    State of Georgia, Certificate No. B-1835, CERTIFY that
5    acting in such capacity, I reported the testimony herein,
6    and on the foregoing pages have transcribed a true and
7    correct transcript thereof.
8              I further certify that I am not counsel for,
9    nor am I related to any party in the above case; nor am I
10   interested in the event or outcome.
11             WITNESS my hand and official seal as Certified
12   Court Reporter, State of Georgia, Certificate No. B-1835,
13   this 10th day of January, 2016.
14
15                         _____
16                         JANET S. PARIS, CCR
                           Certificate No. B-1835
17
18
19
20
21
22
23
24
25
```

```
 1              Deposition of Kenneth M. French - 12/14/2015

 2                        E R R A T A   P A G E

 3           I, _____ , the
        witness herein, have read the transcript of my testimony
 4      and the same is true and correct, to the best of my
        knowledge, with the exception of the following changes
 5      noted below, if any:

 6      Page / Line /              Change              / Reason

 7      _____      _____

 8      _____      _____

 9      _____      _____

10      _____      _____

11      _____      _____

12      _____      _____

13      _____      _____

14      _____      _____

15      _____      _____

16      _____      _____

17      _____      _____

18      _____      _____

19      _____      _____

20      _____      _____

21

22                         _____

        Sworn to and subscribed before me,
23      this the _____ day of _____, 2016.

24                         _____
                           Notary Public
25                         My commission expires:
```

Randolph Jones, Jr., et al. vs.
Advance Bureau of Collections, LLP, et al.

Kenneth M. French
December 14, 2015

## $

**$150 (1)**
10:9
**$2,300 (1)**
50:5
**$60,000 (1)**
9:6
**$75,000 (1)**
49:4

## A

**ABC (31)**
8:24,24,25;9:3,5;
10:6;12:23;14:23;
21:8;28:6;29:20;
32:1;37:24;39:9,16;
40:11,24,25;41:9,20;
42:6,11;43:12;44:1,
7;48:3,8,18,24;49:15;
50:15
**ABC's (2)**
23:15,18
**ability (2)**
7:13;33:5
**able (6)**
7:10;27:24;31:5;
33:25;36:3;47:2
**Absolutely (4)**
9:16;20:11;23:21;
42:19
**ACA (4)**
31:19;51:20,22,24
**access (8)**
32:15;33:2,3,18,20,
21;35:12;36:4
**accessed (4)**
32:24,25;33:1;43:8
**account (16)**
14:25;15:5,23;
16:1,2,25;19:2,17;
20:6;23:15,16,17,18,
18;32:9;42:21
**accounts (2)**
12:18;18:3
**accurately (1)**
47:3
**accused (1)**
24:12
**achieve (1)**
11:3
**across (1)**
39:24
**action (13)**
14:16;15:6,11,19,
22;16:3,6,12;17:21;
18:13,20,22;22:24
**actions (1)**
28:7
**actual (1)**
11:14

**actually (2)**
19:22;29:13
**adapted (1)**
29:19
**addresses (4)**
36:13;37:15,25;
40:3
**Advance (4)**
5:4;8:4,11,23
**affect (1)**
7:13
**affirmatively (5)**
11:10;14:22;16:19;
34:14;45:24
**again (2)**
7:21;36:23
**against (5)**
19:7;22:22;24:8,9;
25:8
**agency (2)**
22:15;48:1
**aggravations (1)**
47:25
**aggregate (1)**
18:19
**ago (13)**
10:2,14;26:23;
43:18;45:19;47:10,
18,20;51:5,9;52:12,
22,22
**agree (1)**
15:25
**agreed (1)**
46:4
**agreement (12)**
22:16;43:22;44:9,
16,18,23;45:5,18;
52:15,17,19;53:22
**ahead (1)**
12:2
**aid (1)**
35:24
**al (1)**
5:5
**allegation (1)**
26:24
**allegedly (1)**
20:13
**allow (1)**
11:24
**almost (1)**
46:25
**along (1)**
17:20
**although (1)**
52:2
**always (3)**
16:21;20:9;42:7
**amended (2)**
28:16;29:6
**American (1)**
51:25
**amount (3)**

**9:20;42:2,15**
**answered (1)**
35:1
**anymore (1)**
50:20
**Apparently (2)**
27:23;38:1
**appealing (1)**
47:11
**appear (2)**
25:20,23
**appraisal (2)**
46:1,3
**approach (1)**
46:4
**approaching (1)**
44:2
**approve (1)**
35:13
**Approximately (4)**
9:6;31:25;40:2;
41:9
**arbitration (1)**
42:22
**argue (1)**
18:25
**around (1)**
41:24
**aside (4)**
24:10;26:5;31:22;
35:3
**assign (1)**
13:9
**assigned (2)**
17:23;20:14
**assigning (2)**
15:5;19:17
**assignment (2)**
12:18;16:15
**assignments (1)**
13:13
**assigns (1)**
14:25
**Association (3)**
51:12,25;52:1
**associations (2)**
31:20;51:20
**assuming (1)**
15:4
**attended (1)**
51:9
**attorney (16)**
11:24;14:15;18:22;
19:9;20:9;21:8,10;
25:16;26:14;30:8,11;
31:22,24;35:4,6;43:8
**attorneys (6)**
26:5;29:22,23;
35:3;38:21,25
**audible (1)**
6:25
**AUST (53)**
11:17,20;12:25;

**13:10,15,20;14:6;**
**16:8;17:2,8;19:19;**
**20:15;22:1,9,13;23:1,**
**6,11,20;24:14;25:19,**
**23;27:6;28:8,13,24;**
**31:8;32:11;34:5,9;**
**36:15,24;37:11;39:5,**
**7,12,15;40:13;44:22;**
**46:13;48:20,25;**
**49:10;50:24;51:2;**
**52:8,24;53:1,3,5,17;**
**54:5,8**
**auto (1)**
41:3
**avoid (3)**
29:19,20;32:2
**aware (2)**
10:12;37:14

## B

**back (7)**
29:25;35:10;43:22;
50:11,13;52:21;53:3
**bad (1)**
32:18
**balance (1)**
14:14
**bank (3)**
23:12,15,16
**based (1)**
14:12
**basis (10)**
9:18;11:2;13:22;
27:13;36:7;45:10;
48:17;51:8,9,19
**beginning (1)**
11:24
**behalf (8)**
15:12,19;16:7;
18:20;28:17;29:4;
35:13;50:14
**belong (1)**
27:17
**benefits (1)**
10:10
**best (1)**
8:1
**big (2)**
7:3;9:13
**bills (2)**
17:15;18:5
**bind (1)**
35:15
**birthday (1)**
10:20
**bit (3)**
10:25;37:23;50:10
**bonus (1)**
10:3
**bonuses (1)**
9:25
**both (1)**

**53:25**
**break (5)**
6:18,20,21;50:11,
18
**bring (8)**
13:9;15:6,11;16:3;
18:20,22;19:7,9
**broad (1)**
26:12
**brought (2)**
16:6;21:23
**building (3)**
49:15,20,21
**Bureau (1)**
5:4;8:4,12,23
**business (11)**
8:11;32:5,6;40:17,
19;43:17;45:21;46:1;
47:5,15;49:8
**businesses (1)**
41:2
**buy (1)**
13:5
**buy- (1)**
45:17
**buyer (1)**
13:2
**buying (1)**
47:9
**buy-sell (9)**
43:22;44:9,15,23;
45:5;52:15,17,19;
53:22

## C

**call (4)**
15:13;35:11;41:4;
42:14
**called (2)**
16:15;30:15
**calls (8)**
12:11;27:6;40:13;
46:13;48:20,25;
49:10;53:13
**came (1)**
27:18
**can (28)**
7:10;8:3;10:22,25;
11:22;12:2;14:15;
15:5;17:11,20;25:2;
28:21;29:17;30:4,7;
31:20;32:11,25,25;
33:17;37:6,9,23;
38:15;49:2;50:22;
53:1;54:8
**capable (1)**
35:18
**card (1)**
48:9
**cards (1)**
48:6
**case (9)**

Case 5:15-cv-00016-MTT   Document 81   Filed 12/13/16   Page 60 of 66

Randolph Jones, Jr., et al. vs.
Advance Bureau of Collections, LLP, et al.

Kenneth M. French
December 14, 2015

5:3,5;24:7;26:4,7,
13;29:21;39:3;42:21
**cases (2)**
19:23;24:3
**cause (1)**
7:17
**ceased (1)**
10:2
**Center (2)**
18:12;30:17
**certain (3)**
12:18;27:15;44:4
**change (18)**
15:9;30:3,7,10;
31:6,12,14,15;32:7,
17,19,22;33:7,11,22;
34:1,3;35:18
**changed (6)**
31:6;32:10,14;
33:4,14,16
**changes (7)**
15:10;29:24;30:4;
31:4;35:7,13,15
**CHAPMAN (1)**
52:25
**charged (1)**
24:17
**check (1)**
42:13
**cheer (1)**
11:1
**cheerleader (1)**
10:24
**claim (1)**
17:21
**claims (1)**
18:13
**clarify (1)**
36:18
**clear (1)**
37:8
**client (5)**
13:8,8;14:7;23:13;
42:8
**clients (10)**
14:2,18;17:25;
21:15,18;40:22;41:2,
9,18;47:6
**client's (1)**
42:14
**close (1)**
52:12
**closing (1)**
54:5
**coach (3)**
37:7,9;51:8
**coaching (2)**
36:22;37:12
**cold (1)**
7:25
**collect (3)**
12:9,23;40:12
**collected (1)**

42:2
**collection (12)**
12:8,12,13,14,21;
15:6;21:9,11;22:15;
47:5;48:1;51:21
**Collections (6)**
5:4;8:4,12,24;
11:14;40:11
**collector (6)**
11:16;12:5,18,22;
18:16;51:22
**Collectors (2)**
51:12,25
**combined (2)**
45:23;46:9
**commissions (1)**
9:25
**companies (1)**
41:4
**company (5)**
10:9;11:12;14:11,
15;32:16
**compensation (4)**
9:5;10:1,4,7
**complaint (6)**
14:11;20:17,17;
25:7;26:25;43:5
**compliance (3)**
26:20;51:14;52:3
**component (1)**
50:13
**computer (2)**
33:24;51:19
**computers (1)**
49:4
**concern (1)**
49:9
**concerning (2)**
29:10;43:12
**conclusion (2)**
27:7;40:14
**confused (2)**
20:24,25
**confusion (2)**
39:13,16
**consent (1)**
22:16
**consider (2)**
12:22;46:2
**consideration (2)**
13:14,21
**considered (1)**
44:3
**consumer (12)**
13:8;14:3,3,23,24;
19:8;20:12;40:12,15,
20;42:5,5
**consumers (2)**
27:20;40:17
**contest (1)**
6:19
**contingency (1)**
13:22

**contributes (1)**
10:9
**convenience (1)**
29:13
**conversation (1)**
7:1
**conversations (1)**
43:16
**convicted (1)**
24:20
**copy (7)**
28:16,20,23;44:9,
18,22;45:4
**correspondence (5)**
51:14,16,17;52:4;
53:13
**costs (1)**
17:23
**cough (1)**
8:1
**coughed (1)**
7:7
**Coughing (1)**
25:15
**counsel (2)**
30:22;45:2
**counter (1)**
12:10
**couple (2)**
49:3;50:24
**course (1)**
51:21
**Court (11)**
5:7;6:24;14:12,16;
17:16,21,24;19:22;
20:7,10;47:2
**covered (1)**
10:15
**credit (3)**
48:4,6;52:1
**creditor (2)**
21:1,2
**crime (4)**
24:12,13,18,20
CROSS-EXAMINATION (1)
6:4
**Crystal (7)**
30:3,10;32:3,23;
35:12;36:4;43:7
**current (1)**
8:7

# D

**daily (4)**
11:2;51:7,9,19
**data (3)**
33:3;35:14,17
**database (1)**
38:3
**date (1)**
14:14
**dated (4)**

52:20,20,21;53:23
**Davis (3)**
17:11;21:12,13
**day (5)**
6:20;18:12;31:19;
52:13;53:13
**days (1)**
10:19
**deal (1)**
7:3
**debt (11)**
11:16;12:8,22;
13:2,9;18:16;20:13;
21:4;40:15,19,20
**debtor (2)**
17:23;20:12
**debts (5)**
12:9,23;13:5;
40:12,17
**declining (3)**
47:6,7,7
**deemed (1)**
35:7
**defendant (1)**
39:3
**defendants (1)**
26:14
**Defense (1)**
29:14
**defining (1)**
44:16
**demand (1)**
14:24
**depending (1)**
42:17
**deponent (1)**
37:6
**deposit (1)**
42:12
**deposition (11)**
5:2;6:13,13;7:4;
24:2,25;25:25;26:17;
50:21;52:14;54:6
**Depot (2)**
48:7,9
**depth (1)**
29:8
**desirable (1)**
48:2
**detail (1)**
10:25
**determine (4)**
11:1;33:15,17;
42:10
**determined (2)**
45:20,22
**dial (3)**
33:5,5,25
**different (2)**
18:4;19:5
**difficulties (1)**
7:17
**direct (2)**

42:16;51:1
**directed (1)**
30:2
**directly (1)**
42:8
**disagree (1)**
37:11
**discovery (4)**
36:16,25;39:8;
52:16
**discuss (1)**
25:16
**discussed (2)**
21:11;26:4,7,13
**DISCUSSION (4)**
25:18;43:13;52:15;
54:4
**discussions (4)**
9:2;43:11,21,24
**District (2)**
5:6,7
**Division (1)**
5:7
**doctor (4)**
14:18;15:19;18:2,
10
**doctors (4)**
18:15,21,23;19:5
**doctor's (1)**
16:7
**document (6)**
19:16;29:2;37:4,
14;38:6,8
**documents (4)**
24:24;25:12,25;
38:22
**done (5)**
27:16;34:8;35:16;
46:25;52:3
**doubt (1)**
40:6
**down (6)**
6:24;35:22;45:15;
47:3,22,24
**Dr (3)**
14:21,23,25
**draw (1)**
9:23
**duly (1)**
6:2
**During (2)**
51:3;52:14

# E

**earlier (5)**
47:8;51:3;52:14;
53:6,10
**easier (1)**
13:25
**edit (1)**
34:18
**edits (1)**

Case 5:15-cv-00016-MTT   Document 81   Filed 12/13/16   Page 61 of 66

Randolph Jones, Jr., et al. vs.
Advance Bureau of Collections, LLP, et al.

Kenneth M. French
December 14, 2015

34:17
**either (4)**
7:7;30:1,22;35:12
**EL (1)**
49:18
**else (7)**
11:7;26:4,10;
35:20,22;49:5;52:24
**else's (1)**
17:21
**e-mail (1)**
51:16
**e-mails (1)**
51:19
**employed (2)**
8:3,5
**employee (3)**
8:20;12:17;33:6
**employees (6)**
11:4,6;32:14;33:3;
51:8;53:16
**employment (1)**
10:10
**enable (2)**
30:9;33:10
**end (1)**
46:20
**endurance (1)**
6:19
**enforcement (1)**
22:24
**engage (2)**
12:8;40:11
**entered (1)**
32:4
**entity (2)**
8:11;49:23
**equal (1)**
46:6
**error (3)**
29:19,21;32:2
**et (1)**
5:5
**even (3)**
28:4;49:12;53:15
**EXAMINATION (1)**
51:1
**example (1)**
23:5
**exchanged (1)**
13:17
**Exhibit (2)**
28:21;38:13
**expect (1)**
6:19
**expense (2)**
46:2,3
**explain (3)**
11:19;37:23;51:24
**explanation (1)**
29:8
**exterminating (1)**
41:4

**extra (1)**
10:7

**F**

**fact (3)**
13:2;32:9,23
**fair (5)**
41:13;46:4;47:16;
48:18;50:6
**familiar (1)**
26:24
**far (2)**
6:12;26:25
**fashion (1)**
8:19
**FDCPA (9)**
26:19,25;27:5,11;
29:23;51:5,9,14;52:2
**fee (1)**
41:20
**feel (1)**
23:21
**feeling (1)**
53:7
**fees (2)**
41:22;47:7
**felt (1)**
53:11
**few (1)**
45:19
**figure (1)**
27:24
**file (5)**
14:11,15;17:24;
32:15,23
**filed (9)**
16:20,25;17:6;
20:17;24:8;25:8;
28:17;29:4,6
**filing (2)**
30:20,24
**Firm (3)**
21:12;29:22;30:4
**first (3)**
6:2;30:8;44:6
**five-minute (1)**
50:18
**focusing (1)**
29:17
**folks (1)**
22:21
**follow (1)**
29:17
**follows (1)**
6:3
**follow-up (2)**
14:1;53:19
**form (3)**
14:6;39:20;52:6
**formal (2)**
51:6;52:2
**forum (1)**

31:19
**four (1)**
17:22
**frame (1)**
43:5
**free (1)**
23:21
**French (8)**
5:3;6:1,8,9;17:10;
21:7;22:6;39:16
**French's (2)**
39:8;54:6
**full-time (2)**
12:18,22

**G**

**gained (1)**
39:2
**garnishment (1)**
23:5
**generate (1)**
41:14
**generated (4)**
36:17,20;37:2;40:3
**generating (1)**
34:19
**Georgia (2)**
5:6;51:11
**gets (1)**
42:11
**given (1)**
44:6
**giving (2)**
7:17;50:14
**goals (1)**
11:1
**goes (5)**
23:12,17;42:6,8,14
**great (1)**
25:9
**gross (3)**
9:9,13,14
**group (3)**
17:20,20;18:4
**guess (4)**
16:11;18:20;21:20;
50:16
**guru (1)**
33:24
**guys (1)**
37:1

**H**

**hand (1)**
28:20
**handling (1)**
18:16
**hands (2)**
15:9,10
**happened (2)**
18:16;27:25

**happens (1)**
14:4
**Happy (1)**
10:20
**head (5)**
7:2,5;10:8,24;50:3
**hear (2)**
7:9,22
**hearing (1)**
7:20
**help (2)**
36:2,3
**helpful (1)**
6:17
**high (1)**
41:11
**highest (1)**
11:11
**Holloway (1)**
49:18
**honest (1)**
42:17
**hope (1)**
23:2
**hour (2)**
6:21;50:10

**I**

**idea (3)**
18:20;32:13;41:1
**identify (1)**
38:15
**impediments (1)**
7:16
**improper (1)**
36:21
**Inaudible (1)**
23:19
**income (3)**
46:7,8,9
**increased (1)**
47:25
**indicates (1)**
27:16
**indicating (1)**
47:1
**indirectly (2)**
21:20,21
**individual (3)**
50:12,21;54:6
**individually (3)**
39:8,10,17
**individuals (1)**
49:19
**industry (3)**
47:12,14;51:21
**influence (1)**
7:12
**information (1)**
38:3
**initial (3)**
27:19;30:12,14

**initiated (1)**
43:24
**input (3)**
33:3;35:14,17
**inspire (1)**
11:2
**instruct (2)**
11:21;33:3
**instruction (1)**
12:2
**instructions (1)**
30:9
**instructs (1)**
12:1
**insurance (1)**
10:12
**integrity (1)**
34:16
**interest (1)**
44:1
**interested (4)**
44:7;47:8,15,17
**into (6)**
14:15;18:5;23:12,
15;30:10;33:25
**involved (1)**
21:10
**IRA (1)**
10:8
**irritation (1)**
47:24

**J**

**James (1)**
21:12
**January (1)**
30:25
**Jones (1)**
5:4
**Jr (2)**
5:4;49:18
**judgment (8)**
21:24,25;22:5,8,19,
20,22,25
**judgments (1)**
23:10

**K**

**Ken (2)**
39:7,16
**Kenneth (3)**
5:3;6:1,8
**key (2)**
10:12;22:14
**kind (2)**
8:11;10:6
**KM (3)**
17:10;21:6;22:6
**knowing (1)**
34:10
**knowledge (10)**

Randolph Jones, Jr., et al. vs.
Advance Bureau of Collections, LLP, et al.

Kenneth M. French
December 14, 2015

10:17;24:11;30:5,
8;31:9,12,13,15;33:8;
34:2
**KOVAC (1)**
50:9
**KOVAL (57)**
5:2;6:5;11:19,23;
12:6;13:1,12,18,23;
14:9;16:10;17:5,9,
13;19:21;20:19;22:2,
11,18;23:4,8,14;24:1,
16;25:21;26:2,3;
27:9;28:10,15,23;
29:1;31:11;32:20;
34:7,13;36:21;37:6,
13;39:6,11,14,18,22;
40:16;45:1;46:15;
48:23;49:7,14;50:17,
20;52:6;53:19,21;
54:3,7

## L

**lack (2)**
33:8,8
**Lamar (2)**
49:20,21
**landlord (1)**
41:3
**last (18)**
16:6,25;25:11,13,
24;26:22;30:19,21,
23,25;31:23;43:8,19;
45:17;47:5;51:4;
52:3,11
**later (1)**
23:13
**law (7)**
20:11;21:12;29:22;
30:4;31:6,12,15
**lawsuit (17)**
17:6,7;18:5;19:7,9,
10,12;21:5,24,24;
24:8;25:8;30:17,20,
24;31:2;36:7
**lawsuits (4)**
20:20;21:10,11,14
**lawyer (2)**
31:16,18
**leave (1)**
29:12
**leaves (1)**
22:21
**legal (2)**
27:7;40:14
**letter (29)**
14:24;27:20;28:12;
29:25;30:24;31:7,23;
32:7,10,14;33:7,11,
14,15;34:4;35:6;
36:6,13,17;37:3,15,
17,18,21;38:19;40:3,
7;42:5;53:7

**letters (14)**
29:10,23;30:5,7,12,
13;32:3,15;34:15;
36:19;37:2;38:1;
53:8,11
**LG (1)**
49:18
**liability (1)**
8:16
**life (1)**
10:12
**limited (1)**
8:16
**lines (1)**
48:3
**list (5)**
37:25;38:2,18;
39:4,5
**listed (1)**
37:15
**little (5)**
10:25;37:23;41:5,
11;50:10
**LLP (4)**
5:4;8:13,15,24
**long (8)**
8:5,9;10:2,14;48:8,
13,14;52:22
**longer (2)**
10:4,5
**look (3)**
28:22;29:13;31:18,
22
**looked (4)**
25:7,9;31:24;45:17
**looking (1)**
41:15
**loss (1)**
7:19
**lot (2)**
14:18;17:16
**loudly (1)**
7:22
**low (1)**
22:14
**lunch (1)**
50:12

## M

**Macon (1)**
5:7
**Magazine (1)**
51:22
**Magistrate (3)**
14:12,16;17:24
**maintained (1)**
34:16
**maintenance (1)**
29:18
**makes (2)**
17:23;42:6
**making (2)**

33:6;35:18
**maliciously (1)**
34:8
**man (2)**
10:12;52:23
**manage (1)**
11:4
**Manager (8)**
8:8,9;10:23;11:11;
12:4;28:6;53:11,12
**many (4)**
11:6;41:9;43:4,7
**marked (2)**
28:21;38:12
**market (1)**
48:18
**may (7)**
29:11;31:6;39:11;
40:4,4,19;51:7
**maybe (8)**
12:7;14:1;17:20;
18:3,12;32:17;41:11;
47:10
**mean (10)**
6:12;8:25;12:16,
17;19:11;40:9,24;
41:17;45:6;48:13
**means (1)**
12:15
**meant (1)**
7:3
**measures (1)**
32:21
**mechanism (1)**
44:15
**medical (7)**
14:18;16:7;17:15,
17;21:3;40:21,23
**medications (1)**
7:12
**meet (1)**
12:10
**member (2)**
8:17;51:22
**memory (1)**
32:18
**met (1)**
6:9
**Middle (2)**
5:6;7:8
**might (7)**
6:17;11:19;17:9;
29:24;33:25;44:3;
49:4
**Miranda (1)**
27:14
**misconstrue (1)**
36:25
**misnomer (1)**
42:19
**missing (1)**
27:1,15
**misunderstood (2)**

12:7;52:10
**moment (1)**
28:22
**money (9)**
13:8,17;14:3,23;
19:6;20:13;42:12,13,
18
**monies (1)**
23:9
**month (5)**
9:19;10:9;17:4;
41:15;50:5
**monthly (2)**
11:1;48:17
**months (1)**
45:19
**more (5)**
10:25;26:11;29:8;
37:23;47:11
**most (5)**
17:15;28:9;45:23;
46:7,8
**mostly (1)**
40:21
**much (1)**
47:12
**muddle (1)**
35:22
**multiple (1)**
18:8
**myself (1)**
35:11

## N

**name (11)**
6:6;14:12,15;
15:11,12,20;18:22;
21:25;23:18;36:8,11
**named (4)**
21:4,6;22:6;24:10
**names (5)**
36:13;37:1,15,25;
40:3
**necessarily (1)**
33:22
**necessary (1)**
35:8
**need (8)**
6:18,20;7:20;
25:16;28:23;29:24;
31:21;36:3
**needed (4)**
30:4;31:15;33:4;
35:8
**needs (3)**
6:25;7:4;36:2
**negatively (2)**
10:8;50:3
**net (5)**
45:23;46:7,8,9;
48:24
**next (2)**

22:7;34:18
**Nine (2)**
11:8,9
**nobody (4)**
25:14;30:4;32:14,
16
**nod (1)**
7:4
**Nodding (2)**
11:10;14:22
**noise (1)**
7:8
**none (1)**
32:14
**notice (9)**
20:13;30:14,15,16,
16,19,20;43:4,9
**Notices (2)**
34:20,25
**notwithstanding (1)**
29:18
**Number (5)**
5:5;9:13,13;25:9;
38:8

## O

**object (5)**
11:20;45:10,12,14;
52:6
**Objection (36)**
11:17,25;12:25;
13:10,15,20;14:6;
16:8;17:2,8;19:19;
20:15;22:1,9,13;23:1,
6,11;24:14;27:6;
28:8,13;31:8;32:11;
34:5,9;36:15,22;
37:9;40:13;45:4,7;
46:13;48:20,25;
49:10
**objections (1)**
22:4
**obtained (2)**
22:8;32:4
**obviously (2)**
27:16;50:22
**occasions (1)**
12:23
**occur (2)**
29:24;44:5
**occurred (1)**
29:21
**occurs (1)**
53:15
**OFF (6)**
25:18;50:19;53:2;
54:4,8,10
**offenders (1)**
17:17
**office (10)**
16:7;30:3,14;
38:20;40:4;42:12,14;

Case 5:15-cv-00016-MTT   Document 81   Filed 12/13/16   Page 63 of 66

Randolph Jones, Jr., et al. vs.
Advance Bureau of Collections, LLP, et al.

Kenneth M. French
December 14, 2015

48:7,8;49:22
**often (1)**
30:11
**old (4)**
10:18,19;32:17;
45:6
**omitted (1)**
27:22
**once (1)**
22:7
**one (16)**
14:2;17:21;18:5,
13,21;19:7,9;20:2;
23:7;24:10;28:25;
30:7;33:3;35:14,23;
53:15
**ongoing (1)**
49:9
**operate (1)**
49:22
**opinion (2)**
27:4,10
**opposed (3)**
7:4;15:20;17:24
**option (1)**
44:6
**original (3)**
20:5;21:1,2
**others (1)**
11:9
**out (12)**
9:15,15;27:24;
28:3,12;29:12;30:12;
32:3;35:21;37:16;
38:25;42:5
**outside (2)**
30:21;35:25
**over (6)**
6:16;7:25;12:11;
25:9;31:19;50:10
**overview (1)**
13:25
**owe (1)**
40:18
**owed (3)**
14:3;18:15;19:6
**owes (3)**
13:8;14:23;20:13
**own (8)**
15:23;16:1,2;
17:16;19:2;49:2,5,15
**owner (2)**
8:19;20:5
**owners (1)**
46:1
**ownership (2)**
15:5,9
**owning (1)**
48:1
**owns (1)**
49:17

**P**

**page (4)**
29:13;36:12;37:14;
38:2
**pages (1)**
40:2
**paid (11)**
9:17;10:1,7;13:13;
42:10,11,15,15;46:6;
49:19,20
**paper (1)**
39:21
**part (4)**
18:1,7;20:16;50:12
**particular (1)**
29:9
**parties (1)**
18:8
**partner (1)**
8:18
**partnership (3)**
8:16,17;49:25
**party (1)**
19:10
**passwords (3)**
33:9,10,18
**past (2)**
25:10;51:11
**Patat (2)**
34:23;35:19
**pay (8)**
12:11;14:3,24;
17:18;18:2;22:17;
42:16;48:17
**paying (1)**
17:25
**payment (5)**
12:11;42:6,6,13,16
**PDF (2)**
39:20,23
**pending (1)**
5:5
**people (22)**
11:2,8;17:22,22;
22:15;30:2,9;33:2,19,
23,25;35:12,14,17;
36:13;37:2,15;38:1,
19;40:3;43:4;51:8
**percent (3)**
7:19;22:15;41:25
**percentage (1)**
41:1
**Perhaps (1)**
52:10
**period (1)**
51:13
**periodic (1)**
34:25
**person (2)**
36:8,11
**personally (2)**

13:9;53:14
**person's (1)**
36:4
**phone (1)**
12:12
**physically (1)**
44:13
**place (5)**
29:20;32:2,21;
34:15,24
**places (1)**
41:5
**plaintiff (4)**
20:21,25;21:1;
52:16
**plaintiffs (3)**
21:4,6;22:6
**Plaintiff's (5)**
28:21;38:12;40:1,
2;42:21
**plan (1)**
22:17
**plans (2)**
8:22,25
**please (6)**
5:8;6:7;28:24;
36:22;37:12;53:4
**point (7)**
6:18,21;14:25;
16:1;27:22;44:2;48:1
**policy (2)**
10:13;29:10
**position (2)**
8:7;18:24
**practice (3)**
6:21;16:7;20:11
**practices (3)**
14:18;21:3;40:21
**predict (1)**
49:12
**preparation (2)**
24:24;25:12
**preparing (1)**
25:13
**president (1)**
51:11
**pre-tax (1)**
9:8
**pretty (2)**
7:21;41:13
**prevent (2)**
32:21;33:6
**price (5)**
44:16;45:20,22;
46:6;50:6
**primarily (1)**
40:20
**printers (1)**
49:3
**prior (2)**
30:20,24
**Probably (12)**
17:3;22:5;26:23;

40:23;41:14,24;44:4;
45:19;46:20,23;
48:14;52:12
**problem (1)**
7:23
**procedure (3)**
31:13,14;34:24
**procedures (3)**
29:18,20;32:1
**proceed (1)**
37:12
**process (7)**
6:17;11:5;34:15,
19;42:4,13,15
**produced (2)**
6:2;38:21
**Professionals (1)**
52:1
**profit (2)**
10:6;46:3
**profits (3)**
45:23;47:7,22,24
**provide (2)**
20:12;45:2
**provided (5)**
20:18;36:12;38:5,
18;44:17
**providers (1)**
17:17
**provision (1)**
42:22
**purchase (2)**
43:12,17
**purchases (1)**
48:16
**purchasing (3)**
44:1,7;47:15
**purpose (1)**
29:7
**purposes (1)**
7:3
**put (1)**
41:5

**Q**

**qualified (1)**
34:21
**quick (1)**
52:25

**R**

**Randolph (1)**
5:3
**range (2)**
41:23,24
**Rarely (2)**
19:24;22:23
**rather (2)**
15:12;46:19
**reading (1)**
29:16

**readings (1)**
31:19
**real (2)**
37:8;52:25
**really (1)**
48:1
**reason (9)**
17:11,11,15;31:3;
33:21;34:12;39:1;
40:6;42:20
**reasonable (1)**
17:24
**reasonably (1)**
29:18
**recall (4)**
32:18;43:21,22;
52:15
**receive (2)**
51:13,17
**received (16)**
10:3;20:16;26:19,
22;28:16;36:6,13,16,
19;38:19;40:4,6;
42:18;51:5,17;52:4
**receives (1)**
41:20
**recent (2)**
45:23;46:8
**recently (1)**
28:16
**record (13)**
6:6;22:4;23:23;
25:18;37:8;45:12,14;
50:19;53:2,3;54:4,9,
10
**RECROSS-EXAMINATION (1)**
53:20
**reduces (1)**
17:22
**refer (5)**
8:23;18:9;29:11;
30:12;52:1
**referenced (1)**
43:5
**referred (1)**
38:9
**referring (3)**
9:12;37:4;38:7
**regarding (2)**
26:19;43:17
**regular (2)**
7:1;9:17
**related (3)**
37:3,15,17
**relevancy (14)**
13:10,15;16:8;
17:2,8;19:19;20:15;
22:1,9,13;23:1,6,11;
24:14
**remain (1)**
34:17
**remainder (1)**
41:1

Case 5:15-cv-00016-MTT   Document 81   Filed 12/13/16   Page 64 of 66

Randolph Jones, Jr., et al. vs.                                        Kenneth M. French
Advance Bureau of Collections, LLP, et al.                         December 14, 2015

**remember (3)**
  25:4,6,7
**remitted (1)**
  23:13
**rent (5)**
  41:4,5;49:19,20;
  50:4
**Rental (1)**
  41:7
**renting (1)**
  50:7
**repair (1)**
  41:3
**repeat (3)**
  7:9;17:17;43:1
**Report (6)**
  30:10;32:3;34:1;
  35:12;36:12;42:14
**reporter (2)**
  6:24;47:2
**Reports (3)**
  30:3;36:4;43:7
**Report's (1)**
  32:23
**represent (2)**
  21:19,22
**representing (3)**
  20:9;21:13,17
**represents (2)**
  21:8;40:1
**request (3)**
  36:25;38:22;52:16
**requested (3)**
  32:16;37:1,1
**required (2)**
  31:6;34:18
**rescheduled (1)**
  26:1
**response (5)**
  6:25;7:1;38:21;
  52:9,10
**responses (1)**
  39:8
**responsibilities (1)**
  10:22
**responsibility (4)**
  28:6,11;53:12,16
**responsible (4)**
  53:7,8,11,14
**Restate (1)**
  27:8
**retail (1)**
  41:3
**retire (2)**
  8:22,25
**retiring (1)**
  9:3
**review (12)**
  24:24;29:23,25;
  30:11;31:3;34:15,25;
  35:6,10;38:24;39:1;
  51:7
**reviewed (9)**
  25:2,11,20,25;
  30:20,21,23;35:5;
  43:8
**reviewing (1)**
  30:8
**reviews (1)**
  30:1
**Right (45)**
  8:20;9:10;14:19;
  15:2,3,4,11,13,19,22;
  16:3,11,12,14;17:19;
  18:18;19:2,11,14,17;
  21:21;22:22;26:2;
  27:22;28:2,7;29:16;
  30:17;31:17,24;
  33:20,23;35:9;36:14;
  39:14;41:18,19;42:1,
  3,24;46:10,11,16,19;
  47:12
**rights (1)**
  19:7
**Roger (1)**
  17:10
**room (1)**
  41:5
**rules (1)**
  11:24

## S

**sale (5)**
  43:12,17;44:3,5;
  45:21
**same (4)**
  9:20;18:12;34:18;
  37:22
**Sam's (2)**
  48:7,11
**saying (7)**
  9:9;19:1,2;25:24;
  36:19;38:24;53:10
**scenario (2)**
  14:4;22:12
**screen (1)**
  39:24
**Second (2)**
  29:14;53:1
**sell (2)**
  45:18;49:6
**seminar (2)**
  51:9;52:11
**send (2)**
  29:25;35:10
**sends (1)**
  14:23
**sent (19)**
  27:20;28:12;36:18;
  37:16,18,21;38:1,19,
  22,25;39:16,20;40:6;
  42:5;43:5;53:7,9,11,
  13
**SEP (1)**
  10:8

**separate (3)**
  18:3,4,21
**serious (1)**
  12:1
**served (1)**
  30:25
**server (1)**
  49:3
**service (1)**
  14:15
**several (5)**
  18:15,23;19:5;
  21:3,4
**Shaking (2)**
  10:8;50:3
**sharing (1)**
  10:6
**shook (1)**
  7:2
**shops (1)**
  41:4
**short (1)**
  50:10
**show (5)**
  20:7;38:10,12;
  45:12,14
**showed (2)**
  25:14,22
**sick (1)**
  35:21
**sign (2)**
  14:8;22:16
**signed (1)**
  53:25
**single (3)**
  17:21;18:13;52:13
**sit (1)**
  35:22
**situation (1)**
  14:2
**situations (2)**
  13:7;47:25
**small (1)**
  17:16
**Smith (3)**
  14:21,23,25
**softly (1)**
  7:19
**software (8)**
  30:1,9;32:16;33:2,
  19,23;35:11;36:4
**solely (1)**
  8:20
**somebody (4)**
  12:10,11;30:2;
  35:21
**someone (2)**
  17:21;32:6
**sometimes (4)**
  16:22,23;42:8,19
**somewhere (1)**
  41:12
**sorry (7)**

  12:13;25:15,16;
  30:6;36:10;43:1;
  45:13
**sort (2)**
  13:25;24:6
**space (1)**
  50:7
**speak (4)**
  7:19,20;17:22;
  18:14
**specialize (1)**
  29:23
**specific (1)**
  26:11
**speculate (1)**
  34:11
**speculation (5)**
  34:5;46:14;48:21;
  49:1,11
**sprinkling (1)**
  40:19
**staff (1)**
  28:7
**standard (3)**
  24:6,22;41:20
**started (2)**
  24:2;51:10
**state (3)**
  6:6;11:25;37:9
**statements (2)**
  41:14,17
**States (1)**
  5:6
**stating (2)**
  22:4;37:8
**stay (1)**
  11:2
**steadily (3)**
  47:6,6,7
**step (2)**
  11:5;22:7
**still (5)**
  10:15;11:20;18:13;
  22:21;46:11
**STIPULATIONS (1)**
  5:1
**Storage (2)**
  41:6,7
**Street (2)**
  49:20,21
**strike (1)**
  21:9
**study (1)**
  27:16
**stuff (2)**
  41:6,8
**subject (1)**
  42:21
**sue (4)**
  19:3,14,18;22:16
**suggestions (1)**
  35:7
**suing (2)**

  17:7;21:3
**suit (1)**
  13:9;16:20,25;
  18:21
**support (1)**
  36:5
**sure (11)**
  9:1;11:2;12:15;
  14:17;20:8;31:5;
  34:15;35:15;41:15;
  42:4;47:2
**Surgery (1)**
  18:12
**swear (1)**
  5:8
**sworn (1)**
  6:2
**system (4)**
  36:17,20;37:2;
  42:13

## T

**talk (2)**
  7:21;11:6
**talked (1)**
  10:1
**talking (1)**
  28:17
**Tammy (4)**
  34:23;35:19,21,22
**tax (3)**
  9:8,23,24
**taxes (1)**
  9:15
**TCPA (1)**
  51:10
**technical (1)**
  33:8
**tells (1)**
  31:20
**term (1)**
  16:16
**testified (1)**
  6:3
**testifies (2)**
  20:2,4
**testimony (3)**
  50:14;51:3;53:6
**theory (1)**
  34:3
**therefore (2)**
  19:5;24:17
**though (3)**
  28:2;33:23;38:4
**thought (6)**
  12:7,8;20:24;
  25:21;35:4;53:23
**three (7)**
  10:19;17:22;18:3,
  4,4,13,14;45:23;46:8
**three-fourths (1)**
  22:5

Case 5:15-cv-00016-MTT   Document 81   Filed 12/13/16   Page 65 of 66

Randolph Jones, Jr., et al. vs.
Advance Bureau of Collections, LLP, et al.

Kenneth M. French
December 14, 2015

**three-year (1)**
  46:3
**times (3)**
  18:4;25:9;43:7
**titled (1)**
  17:7
**today (6)**
  7:14,18;24:25;
  25:12;47:15,21
**together (1)**
  18:5
**told (1)**
  7:25
**top (1)**
  10:1
**total (1)**
  46:3
**track (1)**
  11:3
**trade (2)**
  31:20;51:20
**train (1)**
  51:8
**training (4)**
  26:19;51:5,6;52:3
**transfer (10)**
  14:8,12,13;15:14,
  15;16:17,18;17:10;
  19:6;20:21
**transferee (6)**
  19:13,14;21:2,7,
  17;22:6
**transferred (8)**
  15:16,18,22;16:4,
  12;17:1;19:3,17
**transferring (1)**
  14:13
**transfers (1)**
  14:14
**trends (2)**
  47:11,14
**tried (1)**
  33:15
**Trimble (10)**
  26:8,9,16,17;30:1;
  35:11;43:17,25;
  49:18;53:25
**trouble (1)**
  43:1
**true (3)**
  13:19;44:19,20
**truthful (2)**
  7:13,17
**try (2)**
  7:9;11:1
**trying (6)**
  15:15,17;16:24;
  18:25;26:12;47:3
**turn (1)**
  14:11
**Twice (1)**
  9:19
**Two (5)**

27:1,15;29:14;
49:19;51:20
**tying (1)**
  18:25
**type (6)**
  10:7;40:11;49:23;
  51:6,16,16
**types (1)**
  19:23;41:2
**typical (2)**
  14:4;22:12

**U**

**under (2)**
  7:12;29:14
**understood (4)**
  16:12;20:25;35:2,4
**unit (4)**
  12:12,13,14,21
**United (1)**
  5:6
**units (1)**
  41:6
**unless (2)**
  11:21,25
**unpaid (1)**
  18:13
**up (5)**
  7:20;20:7;25:22;
  50:11;51:11
**updates (2)**
  52:4,12
**upon (2)**
  42:17;46:4
**used (1)**
  27:19

**V**

**valuable (1)**
  13:14
**value (2)**
  48:18;49:8
**variable (1)**
  41:22
**varies (1)**
  22:10
**vary (1)**
  9:22
**verbiage (1)**
  29:25
**verified (1)**
  14:14
**viewing (1)**
  19:1
**violation (4)**
  26:25;27:5,11,15
**vs (1)**
  5:4

**W**

**W-2 (1)**
  9:7
**wages (2)**
  9:7,9
**wait (1)**
  46:20
**warrant (1)**
  17:16
**way (7)**
  7:10;16:11;33:17;
  34:10;37:22;43:22;
  52:21
**what's (8)**
  15:18;19:11;22:7;
  27:13;28:20;30:16;
  34:19;38:12
**whispering (1)**
  23:19
**whole (2)**
  6:20;46:20
**Whose (1)**
  21:25
**win (1)**
  21:23
**wins (1)**
  21:24
**wish (1)**
  44:19
**within (5)**
  11:11;17:3;30:2;
  32:4,6
**without (3)**
  30:8;35:24;36:4
**WITNESS (36)**
  11:18;12:4;13:11,
  16,21;14:7;16:9;
  17:3,9;19:20;20:5,
  16;22:10,14;23:2,7,
  12,24;24:15;27:8;
  28:9,14;31:9;32:13;
  34:6,10;36:22;37:7,
  10;39:19;40:15;
  44:24;48:22;49:2,12;
  50:16
**wording (1)**
  32:19
**words (6)**
  27:1,2,15,19;28:3;
  29:17
**work (6)**
  12:12,13,14,21;
  37:24;41:21
**working (1)**
  13:22
**works (2)**
  12:19;14:1
**worth (1)**
  48:24
**wrap (1)**
  50:11
**writing (1)**
  27:3
**wrong (3)**

15:8;46:18;51:4

**Y**

**y'all (2)**
  31:5;40:24
**year (5)**
  9:6;25:10;30:25;
  46:21,25
**years (20)**
  8:6,10;10:19;
  26:23;32:17;43:18;
  44:4;45:6,23;46:8,
  20;47:6,10,17,20;
  51:5,9;52:3,12,22
**young (1)**
  52:23

**0**

**07 (1)**
  30:22
**08 (1)**
  30:22

**1**

**10 (10)**
  26:23;47:6,10,17,
  20;49:3;51:5,9;52:3,
  12
**11:14 (1)**
  54:10
**1150 (1)**
  9:23
**12 (1)**
  43:18
**13 (1)**
  46:23
**14 (1)**
  46:23
**15 (3)**
  43:18;45:6;46:23
**15th (1)**
  9:24
**1956 (1)**
  51:23
**1992 (2)**
  52:21;53:23
**1st (1)**
  9:23

**2**

**200 (4)**
  37:25;40:2;41:14,
  17
**200- (1)**
  38:1
**2008 (2)**
  31:23;35:5
**200-plus (2)**
  36:12;37:14

**2012 (1)**
  46:12
**2013 (1)**
  46:12
**2014 (1)**
  46:12
**2015 (1)**
  46:12
**23 (2)**
  28:21;52:22

**3**

**3 (3)**
  38:13;40:1,2
**30 (1)**
  7:19
**300 (2)**
  41:11,12
**30b6 (1)**
  50:13
**35 (3)**
  41:24,25;44:4
**3850 (1)**
  9:24

**4**

**44 (1)**
  8:10
**47 (1)**
  8:6

**5**

**5:15-CV-CV00016 (1)**
  5:5

**6**

**60,000 (1)**
  9:12
**65 (1)**
  49:4

**7**

**73 (2)**
  10:19;32:17
**75/25 (1)**
  40:23

**8**

**8 (1)**
  41:11

**9**

**90 (1)**
  22:15
**900 (2)**
  41:11,12

Randolph Jones, Jr., et al. vs.
Advance Bureau of Collections, LLP, et al.

Kenneth M. French
December 14, 2015

**92 (2)**
43:23;53:24
**93 (1)**
43:23